**James D. STALTER, Jr., Plaintiff,**

v.

**BOARD OF COOPERATIVE EDUCATIONAL SERVICES OF ROCKLAND COUNTY Defendant.**

**No. 02 CIV. 5513(CM).**

United States District Court,
S.D. New York.

Dec. 13, 2002.

Neal Brickman, New York City, for Plaintiff.

## MEMORANDUM DECISION

MCMAHON, District Judge.

Plaintiff James D. Stalter, Jr. ("Stalter") sued defendant Board of Cooperative Educational Services of Rockland County ("BOCES") under the Americans with Disabilities Act ("ADA") and the New York Executive Law, claiming that BOCES discriminated against him because he had cerebral palsy and could not speak. BOCES moves for summary judgment (under Federal Rule of Procedure 56) and dismissal for failure to state a claim (under Federal Rule of Civil Procedure 12(b)(6)).[1] Stalter has voluntarily withdrawn his state law claims as well as his claims for punitive damages under the ADA.

For the reasons stated below, BOCES's motion is denied.

### I. The Undisputed Facts

Stalter first began working for BOCES in 1963, and has worked as a custodian for BOCES since 1986.[2] His job consisted primarily of cleaning the interior of the Kaplan School, including the building's fixtures and equipment.

Stalter has suffered from cerebral palsy since birth. As a result of this illness, he has a diminished ability to speak coherently—an affliction that remained unchanged throughout his employment with BOCES. Stalter has learned to communicate by using other forms of communication, such as using audible sounds, written signs, hand spelling, and directional movements. In addition, Stalter has acquired, at his own cost and expense, an "augmentative communication device" that enhances his ability to communicate. BOCES requested, through a letter dated November 16, 2001, that Vocational Education Services program Stalter's communication device to say "an ambulance is needed," "fire equipment is required," and "police are needed." Through these alternative communication techniques and his augmentative communication device, Stalter is able to communicate effectively without speaking.

In October 2000, BOCES employees informed Stalter that he would begin receiving overtime.[3] Stalter worked overtime in Buildings Number 3 and 9 on seven separate occasions—between December 2, 2000 and April 28, 2002—and once refused an offer to work overtime in those buildings. Stalter also worked overtime in Building Number 10 on eight separate occasions—between January 19, 2002 and August 17, 2002—and twice refused offers to work overtime in that building.

### II. Stalter's Claim

Stalter claims that BOCES treated him less favorably than other employees due to his disability or perceived disability. In particular, he claims that (1) he was restricted to working at the Kaplan School, which is generally considered to be an undesirable assignment; (3) he was not

---

1. BOCES does not make clear in its motion papers which of its arguments support dismissal and which support summary judgment. All of its arguments seem to be directed toward summary judgment.

2. In his 56.1 Statement, Stalter denies that there was a gap in his employment with BOCES between 1964–67 despite his assertion to the contrary in his Complaint.

[Compl. ¶ 8] ("There was a brief break in the Plaintiff's employment with BOCES from 1964 through 1967.").

3. Stalter denies BOCES's assertion in its 56.1 Statement that he entered into an agreement with management and the union regarding overtime.

afforded the same overtime opportunities as other custodians; and (3) his request for a change to another, more desirable shift was denied, and a less senior, non-disabled custodian was assigned to the shift instead.

Stalter alleges that around October of 2001 he approached his immediate supervisor, William Gerard, about obtaining more equitable treatment. When he requested the opportunity to work in Building Number 10, Stalter claims, Gerard told him that he could not work there because he was unable to speak. [Stalter Aff. ¶ 11]. According to Stalter, that conversation alerted him to the reason why BOCES had treated him inequitably. He thereafter contacted attorneys to advise him of his legal rights and in January of 2002 he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In April of 2002 he received a "Right to Sue" letter, and he commenced this action in July of 2002.

### III. Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). Once the moving party has made such a showing, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### IV. BOCES's Arguments

In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must establish that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he suffered an adverse employment decision. *See Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 150 (2d Cir.1998); *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 281–82 (S.D.N.Y.1999) (Sotomayor, C.J.).

BOCES asserts three main arguments to support its motion for summary judgment. First, BOCES argues that Stalter fails to satisfy the first requirement—i.e., that he suffers from a disability within the meaning of the ADA—because (1) he does not have a physical or mental impairment that substantially limits one or more of his major life activities; and (2) BOCES did not regard him as having such an impairment.

Second, BOCES argues that Stalter did not suffer an adverse employment decision because (1) the undisputed facts establish

that he was not denied overtime, and (2) denial of a shift change does not constitute an adverse employment action.

Third, BOCES argues that even if this Court finds that denial of a shift change constitutes an adverse employment action, it must still dismiss Stalter's "shift change denial" claim because he did not file his EEOC complaint within 300 days of the allegedly discriminatory act.

## A. Whether Plaintiff Suffers From a "Disability" Within the Meaning of the ADA

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff does not claim to have a record of impairment. Rather, he argues that he is disabled either because he has a physical impairment that substantially limits a major life activity or because he was regarded as having such an impairment by BOCES. Genuine issues of material fact exist as to whether Stalter has, as well as whether BOCES regarded him as having, such an impairment.

### 1. Physical or Mental Impairment That Substantially Limits a Major Life Activity

■■ Courts apply a three-part test to determine whether a plaintiff has an actual disability under the ADA. *See Toyota Mo-*

tor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, ——, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 641 (2d Cir.1998); *Epstein v. Kalvin–Miller Intern., Inc.,* 100 F.Supp.2d 222, 225 (S.D.N.Y.2000). First, the plaintiff must show the presence of a "mental or physical impairment." The plaintiff must then show that the impairment affects a "major life activity." Third, the plaintiff must show that the impairment "substantially limits" that major life activity.

BOCES does not contest that cerebral palsy constitutes a mental or physical impairment.[4] Nor does BOCES contest that speaking is a major life activity.[5] In fact, BOCES does not even contest that plaintiff's ability to speak is substantially limited. Rather, BOCES argues that Stalter's impairment does not substantially limit his ability to "communicate." According to the EEOC regulations, "substantially limit[ed]" means "[u]nable to perform a major life activity that the average person in the general population can perform'" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. 1630.2(j) (2001), *cited in Toyota,* 122 S.Ct. at 690.

■■ To assess whether an impairment is substantially limiting, courts in

4. The EEOC has issued regulations implementing the ADA that define "impairment" to include "any physiological disorder, or condition" that effects the neurological system. 29 C.F.R. § 1630.2(h)(1). The Second Circuit gives the EEOC's regulations "great deference" in interpreting the ADA. *See Reeves,* 140 F.3d at 150 & n. 3; *Muller v. Costello,* 187 F.3d 298, 312 n. 5 (2d Cir.1999).

5. The Second Circuit has explained: "We do not think that such major life activities as seeing, hearing, or walking are major life activities only to the extent that they are shown to matter to a particular ADA plaintiff. Rather, they are treated by the EEOC regulations and by our precedents as major life activities *per se.*" 140 F.3d at 150.

this Circuit typically look to three factors: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact resulting from the impairment. *See id.* at 643 (citing 29 C.F.R. § 1630.20(j)(2)(i)-(iii)). A person is not disabled, however, where an impairment may be corrected by medications or other measures. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Muller,* 187 F.3d at 314. Overall, determining whether plaintiff's impairment "substantially limits" a major life activity is an individualized, fact-specific inquiry. *Colwell,* 158 F.3d at 643.

BOCES argues that the Supreme Court's decision in *Sutton* compels summary judgement in its favor. It does not. In *Sutton,* the Court found that plaintiffs were not disabled because corrective lenses gave them the same 20/20 vision that persons with perfect eyesight have. Here, BOCES argues that Stalter's capacity to communicate through audible sounds, written signs, hand spelling, and directional movements, together with the device he uses that can be programmed to say certain phrases, render him not disabled under the ADA.

*Sutton* is inapposite here because the major life activity at issue is speaking, not communicating. The remedial measures Stalter takes may allow him to *communicate,* but they do not allow him to *speak.* Clearly, Stalter is limited in performing a major life activity. BOCES's motion for summary judgment on this issue is denied.

**2. Regarded as Having an Impairment**

██ Another way to prove "disability" under the ADA is to prove that the plaintiff is "regarded as" having an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(C). The decisive issue is BOCES's perception of

Stalter's alleged impairment. *See Giordano v. City of New York,* 274 F.3d 740, 748 (2d Cir.2001). In addition, Stalter must show not only that BOCES regarded him as somehow disabled, but that it "regarded [him] as disabled within the meaning of the ADA." *Colwell,* 158 F.3d at 646 (citing *Francis v. City of Meriden,* 129 F.3d 281, 284 (2d Cir.1997)).

In his affidavit, Stalter alleges that when he asked his supervisor if he could work in Building Number 10, the supervisor said: "[Y]ou cannot work there because you cannot speak." [Stalter Aff. ¶ 11]. This assertion is sufficient to create a genuine issue of material fact because it tends to establish that BOCES regarded Stalter as having an impairment that substantially limited his ability to speak, which is a major life activity.

**B. Whether Plaintiff Suffered an Adverse Employment Decision**

BOCES argues that Stalter cannot be found to have suffered an adverse employment decision because (1) the undisputed facts establish that he was not denied overtime; and (2) denial of a shift change does not constitute an adverse employment decision.

**1. Genuine Issues of Material Fact Exist as to Whether Stalter was Denied Overtime**

██ The parties do not dispute that the denial of overtime work can constitute an adverse employment action under the ADA. *See Ramsey v. New York City Health & Hospitals Corp.,* 2000 WL 713045, at *6 (S.D.N.Y. June 2, 2000) BOCES argues, however, that the uncontrovertable facts do not establish Stalter's allegations concerning the lack of overtime. In particular, BOCES contends that (1) Stalter had the second highest number of overtime hours on the main campus for

each of three years (1999–2001) prior to his filing of a complaint with the EEOC, during which time only one other custodian, William Nytko, worked more overtime; (2) only one custodian out of eleven in total worked more overtime days than Stalter during the period between September 25, 2001 and March 23, 2002; and (3) Stalter worked more overtime days than any of the other 14 custodial workers during the period between March 24, 2002 and June 30, 2002.

Stalter alleges in his affidavit that he inadvertently contacted BOCES's attorneys in December of 2001 and alerted those attorneys to his belief that BOCES was discriminating against him in violation of the ADA. Assuming that this is true, as is required in considering BOCES's motion for summary judgment, this evidence tends to establish that BOCES denied Stalter overtime. That is because thirteen of the eighteen instances—as set forth in BOCES 56.1 Statement and not disputed by Stalter—when BOCES offered Stalter the opportunity to work overtime occurred during or before December 2001. The earliest that BOCES offered Stalter the opportunity to work overtime in Building Number 10, where Stalter specifically alleges that BOCES told him he could not work due to his disability, was December 8, 2001. Eight of the ten instances when BOCES offered Stalter the opportunity to work overtime occurred on or after January 19, 2002—and Stalter's EEOC filing is dated January 14. Clearly, a trier of fact could infer that only the threat of a lawsuit prompted BOCES to end its discriminatory ways.

**2. Genuine Issues of Material Fact Exist as to Whether the Denial of a Shift Change Constituted an Adverse Employment Decision**

A plaintiff sustains an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment. *See Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 446 (2d Cir. 1999) (relying on *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)); *see also Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000); *Gronne v. Apple Bank for Savings,* No. 98–CV–6091, 2000 WL 298914, at *5 (E.D.N.Y. Feb. 14, 2000). To be "materially adverse," a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady,* 993 F.2d at 136. "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.; see also Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). In applying the "adverse impact" standard, "there are no bright-line rules, [and] courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker,* 108 F.3d at 466, *quoted in Richardson,* 180 F.3d at 446.

Courts have found that "[u]nder certain circumstances, a failure to transfer could constitute an adverse employment action." *Nonnenmann v. City of New York,* 174 F.Supp.2d 121, 132 (S.D.N.Y.2001). A transfer has an adverse impact on the terms and conditions of employment, for example, if the employee: "(i) has the same job responsibilities and compensation but an increase in workload and location-specific stress; (ii) has different job responsibilities; (iii) is no longer eligible for promotion opportunities; or (iv) experiences a net loss in salary ... or [ (iv) ] is

transferred 'from an "elite" division ... which provided prestige and opportunity for advancement, to a less prestigious unit with little opportunity for professional growth.'" *Pimentel v. City of New York*, 2002 WL 977535, at \*3 (S.D.N.Y. May 14, 2002) (citations omitted). Here, Stalter alleges that the position he sought had greater overtime opportunities, was more prestigious, and involved less objectionable duties. There is thus a genuine issue of material fact whether BOCES's denial of a shift change constituted an adverse employment decision.

### C. The 300–Day Filing Period

 BOCES contends that it is entitled to summary judgment because the plaintiff's claims are untimely. Before bringing a claim under the ADA, a plaintiff is required to file a timely EEOC charge. *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). The ADA incorporates the statute of limitations of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e–5(e)); *Harris*, 186 F.3d at 247. In New York, a plaintiff has 300 days from an allegedly discriminatory event to file a charge with the EEOC. *Harris*, 186 F.3d at 247; *Butts v. City of New York Dep't of Housing Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993). "When a plaintiff fails to file a timely charge with the EEOC, the claim is time-barred." *Butts*, 990 F.2d at 1401; *see also* 42 U.S.C. § 2000e–5(e); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996).

The plaintiff in this case filed his original administrative charge with the EEOC on January 14, 2002. BOCES therefore claims that any claim as to allegedly discriminatory acts prior to March 20, 2001 is untimely. Stalter argues that two exceptions to the general 300–day filing period

apply—the "continuing violation" doctrine and equitable tolling.

### 1. Genuine Issues of Material Fact Exist as to Whether the Continuing Violation Doctrine Applies

 Under the continuing violation doctrine, if a plaintiff files a discrimination charge with the EEOC "that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims and acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993); *see also Connecticut Light & Power Co. v. Sec'y of United States Dep't of Labor*, 85 F.3d 89, 96 (2d Cir. 1996); *Cornwell v. Robinson*, 23 F.3d 694, 703–04 (2d Cir.1994). A continuing violation occurs in one of two situations. First, the doctrine applies to situations where there are specific discriminatory policies or mechanisms, such as discriminatory seniority lists. *See Lambert*, 10 F.3d at 53. Second, the doctrine also applies "where there have been specific and related instances of discrimination, and the employer has permitted them to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination." *Fitzgerald v. Henderson*, 251 F.3d 345, 359, 362 (2d Cir.2001). "[A]cts so 'isolated in time ... from each other ... [or] from the timely allegations[ ] as to break the asserted continuum of discrimination' will not suffice." *Id.* at 359 (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998)).

 Genuine issues of material fact exist as to whether BOCES actions toward Stalter constituted a continuing violation. Stalter argues that BOCES actions toward him—including limiting his work to the Kaplan School, denying him a shift change

to Building Number 10, and limiting his amount of overtime work—were part of a policy of prohibiting him from working in a building alone because of his disability. Consistent with this assertion, BOCES admits in its motions papers that "[e]ven if plaintiff was denied an opportunity to work in Building No. 10, BOCES would have a legitimate business reason for doing so. In Building No. 10, plaintiff would be the only BOCES employee on site. If an emergency occurs requiring him to call for help by use of a telephone or other device that requires the ability to use spoken language, he would not be able to perform that very necessary job-related function." [BOCES Memorandum of Law in Support of Motion 10]. And Stalter alleges in his affidavit that when he went to his supervisor to complain about his restriction to the Kaplan School and to request the opportunity to perform work in Building Number 10, a building with more overtime opportunities, his supervisor told him that he could not work there because he was unable to speak. This meeting occurred in October of 2001, within the 300–day statute of limitations. As a result, if this incident was in furtherance of an ongoing policy of discrimination, all claims and acts of discrimination under that policy will be timely even if they occurred prior to March 20, 2001.

## 2. Genuine Issues of Material Fact Exist as to Whether Equitable Tolling Should Apply

 The doctrine of equitable tolling defers the start of the EEOC filing period from the time of the employer's discriminatory action until the time that the employee should have discovered the acts discriminatory nature. *See Dillman v. Combustion Eng'g, Inc.*, 784 F.2d 57, 59 (2d Cir.1986). The doctrine applies when (1) an employer's actively misleading conduct is responsible for the employee's un-

awareness of his cause of action; or (2) extraordinary circumstances have prevented the employee from exercising his rights. *See Miller v. Int'l Tel. and Tel. Corp.*, 755 F.2d 20, 24 (2d Cir.1985). Extraordinary circumstances exist where "it would have been impossible for a reasonably prudent person to learn that his discharge was discriminatory." *Id.*

Stalter alleges that BOCES told him he did not receive the shift change he requested because that shift required a "level one" custodian. Stalter argues that this justification was misleading because the custodian who had previously held the shift was not a level one custodian, and that this misleading conduct was responsible for his unawareness that BOCES discriminated against him due to his disability.

 "A plaintiff seeking to invoke [the equitable tolling] doctrine is ... required to demonstrate that his ignorance is not attributable to a lack of diligence on his part." *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F.Supp. 1308, 1316 (S.D.N.Y.1997). Stalter's affidavit does not state when he found out that the previous custodian at Building Number 10 was not a level one custodian, or what efforts led to that discovery. Unfortunately, the matter cannot be finally determined on the record before me. This issue, too, will go to trial.

## V. Conclusion

Genuine issues of material fact defeat all of BOCES's arguments for summary judgment. This is the decision and order of the Court.